IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| IN RE:<br>PHYSIOTHERAPY HOLDINGS, INC., et al.,<br><br>Debtors. | Bankr. Case No. 13-12965-KG |
| HURON CONSULTING SERVICES, LLC,<br><br>Appellant,<br><br>v.<br><br>PHYSIOTHERAPY HOLDINGS, INC., et al.,<br><br>Appellees. | Civ. No. 14-693-LPS |

Eric D. Schwartz, Esq. and Andrew R. Remming, Esq., MORRIS, NICHOLS, ARSHT & TUNNELL, LLP, Wilmington, Delaware.

Brandy A. Sargent, Esq., STOEL RIVES, LLP, Portland, Oregon.

*Counsel for Appellant Huron Consulting Services, LLC*

Domenic E. Pacitti, Esq. and Michael W. Yurkewicz, Esq., KLEHR HARRISON HARVEY BRANZBURG, LLP, Wilmington, Delaware.

Jonathan S. Henes, Esq., Eric F. Leon, Esq., Nicole L Greenblatt, Esq., David S. Meyer, Esq., Nathaniel J. Kritzer, Esq., and Matthew Kapitanyan, Esq., KIRKLAND & ELLIS, LLP, New York, New York.

*Counsel for the Reorganized Debtors-Appellees Physiotherapy Holdings, Inc.*

## **MEMORANDUM OPINION**

July 13, 2015
Wilmington, Delaware

*signature*

**STARK, U.S. District Judge:**

Pending before the Court is Huron Consulting Services, LLC's ("Huron") appeal from the Bankruptcy Court's Opinion and a series of Orders (D.I. 1-1, 1-2, 1-3, 1-4)[1] granting Physiotherapy Holdings, Inc. and related entities' ("the Debtors") motion to assume one executory contract and reject five other related agreements ("Motion to Assume"). (D.I. 1) For the reasons stated below, the Court will reverse and remand the Bankruptcy Court's Opinion and Order.

## I. BACKGROUND

The Debtors are providers of outpatient physical therapy services throughout the United States. (D.I. 24 at 2) Huron is a national provider of professional consulting services. (D.I. 15 at 4) The parties entered into a series of agreements in 2011, providing that Huron would assist the Debtors in improving their revenue cycle management. (*Id.*) On November 12, 2013, the Debtors filed petitions for chapter 11 bankruptcy relief in the United States Bankruptcy Court for the District of Delaware. Huron objected to the Debtors' proposed plan of reorganization ("the Plan") insofar as it permitted the Debtors to assume certain terms of Huron's software licensing agreement, but allowed the Debtors to reject other less favorable terms. (D.I. 1-1 at 3) The Debtors and Huron resolved this objection by adding the following language to the Plan: "Notwithstanding any provision of the Plan or the Confirmation Order to the contrary, all of Huron's rights, title, interest, claims, defenses or the like with respect to the assumption, assumption and assignment, or rejection of the Huron Agreements are reserved and

---

[1] The Bankruptcy Court issued the substantive order granting the motion on March 19, 2014. (D.I. 1-2) On April 23, 2014, the Bankruptcy Court issued a substantively equivalent revised order that removed ¶ 8 from the March 19 Order, which is not relevant to this appeal. (D.I. 1-3) Also on April 23, 2014, the Bankruptcy Court issued a second amended order to delete an erroneous sentence from the Opinion. (D.I. 1-4 at 2)

1

preserved . . . ." (D.I. 21-22 at DA-1003) On December 23, 2013, the Bankruptcy Court entered an order confirming the Debtors' Plan. (D.I. 1-1 at 3)

Post-confirmation, the Debtors revived this dispute by filing the Motion to Assume pursuant to 11 U.S.C. § 365(c) in the Bankruptcy Court. (D.I. 21-24 at DA-1068) Huron filed an objection to that Motion. (D.I. 21-26 at DA-1126) Out of six total agreements, the Debtors sought to assume (i) the May 19, 2011 Methodology/Software License Agreement ("License Agreement"), and reject (ii) the January 24, 2011 Engagement Letter, (iii) the January 24, 2011 Business Associate Agreement, (iv) the May 19, 2011 Master Agreement ("the Master Agreement"), (v) the May 19, 2011 Project Arrangement Letter ("the Project Letter"), and (vi) the February 1, 2012 Sustained Performance Services Agreement (collectively, "the Agreements"). (D.I. 1-1 at 4 n.3)[2]

In a Declaration attached to the Motion to Assume ("the McGahan Declaration"), the Debtors' Chief Executive Officer and Chief Restructuring Officer details how assuming the License Agreement will aid the Debtors' reorganization. (D.I. 21-24 at DA-1113) The McGahan Declaration explains that Huron had licensed a customized software system to the Debtors to manage their revenue cycles. (*Id.* at DA-1116) He claims that this software is vital to the Debtors' operations moving forward. (*Id.*) Although the Debtors have been actively seeking alternative software systems, this search will last several months. (*Id.*) In the interim, the Debtors claim that they require the licensing rights to continue using the Huron software. (*Id.*)

Conversely, the Debtors believe that the terms of the Master Agreement are too burdensome to assume. The Master Agreement provides Huron with broad indemnification rights against the Debtors, while the indemnity clause in the License Agreement provides Huron

---

[2] The Court will refer to the License Agreement, the Master Agreement, and the Project Letter as the "May 19 Agreements" – the operative agreements in this dispute.

2

much narrower rights. (*Compare* D.I. 25-1 at RA-3, § 2 *with* D.I. 25-2 at RA-10, §§ 4.1-4.2) Because third-party litigation against Huron is foreseeable, the Debtors argue that if they assume the terms of the Master Agreement they risk exposing themselves to greater indemnity liability that would threaten their reorganization. (*Id.*; *see* D.I. 21-24 at DA-1118)

The Bankruptcy Court held a hearing on the Debtors' Motion to Assume and Huron's objection on February 20, 2014. The parties presented the Bankruptcy Court with three issues: (1) whether the assumption of the License Agreement is a sound exercise of the Debtors' business judgment, (2) whether the License Agreement is assumable regardless of Huron's consent, and (3) whether the Debtors can assume the License Agreement and simultaneously reject the other Agreements. (D.I. 1-1 at 5) In its March 19 Opinion and Order, the Bankruptcy Court answered all three questions in the affirmative and granted the Debtors' Motion to Assume. This allowed the Debtors to assume the License Agreement and reject the five other Agreements. (D.I. 1-2 at ¶ 1) Huron's timely appeal to this Court followed.

## II. CONTENTIONS

Huron first contends that the Bankruptcy Court incorrectly determined that the License Agreement was assumable. (D.I. 15 at 11) Huron alleges that because it maintains the right to terminate the License Agreement, the Debtors cannot assign or assume that agreement by operation of 11 U.S.C. § 365(c)(1). (*Id.*) Conversely, the Debtors assert that § 365(c)(1) permits assumption of the License Agreement because Huron failed to exercise its right to terminate. (D.I. 24 at 6)

Next, Huron argues that the Bankruptcy Court incorrectly found that the Debtors exercised sound business judgment by assuming the License Agreement since it "is not an exercise of business judgment to pick and choose between provisions of a single contract." (*Id.*

3

at 19) The Debtors disagree, arguing that assuming the License Agreement is a sound exercise of business judgment because they fully paid for the software and it is necessary for their ongoing reorganization. (D.I. 24 at 19)

Lastly, Huron alleges that the Bankruptcy Court failed to recognize that the parties intended for all Agreements to constitute one complete contract; thus, the Debtors cannot assume the License Agreement without also assuming the terms of all Agreements. (D.I. 15 at 13) Huron relies on *In re Fleming Cos.*, 499 F.3d 300, 308 (3d Cir. 2007), for the proposition that a debtor can only assume a contract *cum onere* – accepting the burdens along with its benefits. (D.I. 15 at 13) The Debtors claim that the Bankruptcy Court correctly determined that all Agreements did not form a single contract, and therefore, their individual assumption of the License Agreement did not violate the principle of *cum onere*. (D.I. 24 at 12–13)

Though Huron principally argued below that all six Agreements form one contract, it now argues on appeal that only the three May 19 Agreements form a single contract. (D.I. 15 at 15) The Debtors contend that Huron cannot raise this "new" theory on appeal. (D.I. 24 at 12–13) The Bankruptcy Court only considered whether all six Agreements created one contract; however, there is evidence in the record that Huron did raise the narrower theory below. (*See* D.I. 17 at DA-1449–53) Further, the parties agree that the ultimate focus of this dispute is whether the Debtors can assume the License Agreement with or without the more burdensome indemnity clause in the Master Agreement. Thus, the Court will only address whether the May 19 Agreements formed a single contract, as the other three agreements are largely irrelevant to the present dispute.

4

### III. STANDARD OF REVIEW

Appeals from the Bankruptcy Court to this Court are governed by 28 U.S.C. § 158. Pursuant to § 158(a), district courts have mandatory jurisdiction to hear appeals "from final judgments, orders, and decrees" and discretionary jurisdiction over appeals "from other interlocutory orders and decrees." 28 U.S.C. § 158(a)(1) and (3). In conducting its review of the issues on appeal, the Court reviews the Bankruptcy Court's findings of fact for clear error and exercises plenary review of questions of law. *See Am. Flint Glass Workers Union v. Anchor Resolution Corp.*, 197 F.3d 76, 80 (3d Cir. 1999). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. U.S. Gypsum Co.*, 333 U.S. 364, 395 (1948). The Court must "break down mixed questions of law and fact, applying the appropriate standard to each component." *Meridian Bank v. Alten*, 958 F.2d 1226, 1229 (3d Cir. 1992).

### IV. DISCUSSION

#### A. Whether the License Agreement is Assumable

The Court first reviews *de novo* the Bankruptcy Court's legal determination that the License Agreement was assumable under 11 U.S.C. § 365(c).[3] (D.I. 1-1, at 6–7) The Bankruptcy Court reasoned that because Huron had the right to terminate the License Agreement, but did not elect to do so, the Debtors maintained the right to assume it. (*Id.*) Huron argues that the Bankruptcy Court erred in reaching this conclusion for three reasons: (1) Huron did not consent to the assumption, (2) the Confirmation Order specifically preserved Huron's

---

[3] The Court will address this issue first before discussing whether the Debtors could assume the License Agreement in isolation from the other Agreements.

5

rights with respect to the Agreements, and (3) the Third Circuit has recognized that a party to a contract may wish to seek authority from the bankruptcy court before unilaterally terminating an unassumable contract. (D.I. 15 at 11) The Debtors respond that Huron's arguments do not provide a sufficient basis to overturn the Bankruptcy Court's decision. (D.I. 24 at 6) They point out that Huron's reservation of rights in the Confirmation Order is irrelevant to the Bankruptcy Court's reasoning. (*Id.* at 8) Further, they argue that the License Agreement itself provides the right to assume the contract notwithstanding Huron's withheld consent. (*Id.* at 9)

Section 365 of the Bankruptcy Code governs when a trustee or a debtor-in-possession can assume or reject an executory contract:[4]

> The trustee may not assume or assign any executory contract or unexpired lease of the debtor, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties, if—
>
> **(1)(A)** applicable law excuses a party, other than the debtor, to such contract or lease from accepting performance from or rendering performance to an entity other than the debtor or the debtor in possession, whether or not such contract or lease prohibits or restricts assignment of rights or delegation of duties; and
>
> **(B)** such party does not consent to such assumption or assignment . . . .

11 U.S.C. § 365(c)(1); *see also* 11 U.S.C. § 1107(a).

Though there are two opposing methods for interpreting § 365(c)(1), the Third Circuit has adopted the so-called "hypothetical test." *See In re West Electronics Inc.*, 852 F.2d 79, 83 (3d Cir. 1988).[5] Under this test, if non-bankruptcy law prohibits the assignment of the executory

---

[4] The parties do not dispute that the Agreements at issue are executory contracts.

[5] This is in contrast to the "actual test," where courts only apply § 365(c)(1) when a debtor actually seeks to assign an executory contract that the debtor-in-possession cannot assign under applicable nonbankruptcy law. *See* Michelle Morgan Harner et al., *Debtors Beware: The*

6

contract, then the trustee or debtor-in-possession may not assume that contract. *Id.* Stated differently, whether a debtor-in-possession can assume an executory contract depends on if it can "hypothetically" assign it.

The Court acknowledges the difficulty of applying this test to the interwoven provisions of the May 19 Agreements. The parties are sophisticated entities and these contracts cover high-end technical services. The Court is also mindful of Huron's challenge in navigating the conflicting objectives of protecting its intellectual property rights, avoiding liability to the Debtors for breach of contract, and honoring the § 362 automatic stay. Though it is a close call, the Court agrees with the Debtors' position that Huron did not appropriately exercise its right to terminate and, consequently, § 365(c)(1) does not prevent assumption of the License Agreement.

The Court first rejects Huron's argument that its withheld consent bars the Debtors from hypothetically assigning the License Agreement. The shortcoming in this position is that a non-debtor can contractually waive its right to later withhold consent to assignment. *See In re Midway Airlines, Inc.*, 6 F.3d 492, 496 (7th Cir. 1993) (concluding that language in an executory contract established that "[the non-debtor party] ha[d] contractually foresworn any right it may have had to object to the assignment of the lease by a bankruptcy trustee"). The License Agreement provides as follows:

> 7.1 In the event of a Change of Status at Client, as described Section 7.1.3 of the Master Agreement, if (i) Huron has a right to terminate this License Agreement but chooses not to exercise that right, or (ii) pursuant to Section 7.1.3.1 Huron has no right to terminate the License Agreement, ***then Licensee shall have the right to assign this License Agreement to the surviving entity***, acquiring entity, lessee or managing party, as such party is described in Section 7.1.3.1 of the Master Agreement, ***without the consent of Huron***.

---

*Expanding Universe of Non-Assumable/non-Assignable Contracts in Bankruptcy*, 13 Am. Bankr. Inst. L. Rev. 187, 235 (2005); *see also, e.g., Summit Inv. & Dev. Corp. v. Leroux*, 69 F.3d 608, 613 (1st Cir. 1995).

7

(D.I. 25-1 at RA-7) (emphasis added) The termination provision of the Master Agreement states:

> "Except as provided in Section 7.1.3.1 below, Huron shall have the right to immediately terminate a Project and the relevant License Agreement by delivering written notice upon a Change of Status at Client if one of the following occurs: . . . (e) Client or the Facility at which Huron is performing the Project . . . files or becomes subject to a petition in bankruptcy . . . ."

(D.I. 25-2 at RA-13)

Reading these provisions in conjunction instructs that if Huron does not exercise its "right to immediately terminate . . . the relevant License Agreement by delivering written notice upon a [bankruptcy filing,]" then "[the Debtors] shall have the right to assign this License Agreement to the surviving entity . . . without the consent of Huron." (D.I. 25-1 at RA-7; D.I. 25-2 at RA-13) Huron offers no evidence indicating that it adhered to these termination requirements, but nevertheless suggests that it still retains the unexecuted right to terminate. (*See* D.I. 30 at 4) To support this contention, Huron relies on the following provision from the Master Agreement: "The right to terminate a License Agreement shall exist both for a Change of Status at Client during a Project and a Change of Status at Client after Project completion, for so long as the License Agreement remains in effect." (D.I. 25-2 at RA-14) ("section 7.1.3.2") Huron reads this language to mean that once an event triggers the right to terminate, this right exists indefinitely. (D.I. 15 at 12)

The Court disagrees with this interpretation. Section 7.1.3.2 protects the existence of the right to terminate, but does not address when that right becomes operable or how Huron executes that right. Section 7.1 of the License Agreement articulates those details. Once a triggering event occurs, then Huron has the "right to *immediately terminate* a . . . License Agreement by delivering written notice *upon* a Change of Status . . . ." (D.I. 25-2 at RA-13) (emphasis added)

8

If the Court accepted Huron's interpretation of section 7.1.3.2, the Debtors' Change in Status would provide Huron with an indefinite option to terminate. Section 7.1 of the License Agreement precludes this outcome, as this section permits the Debtors to assign the agreement notwithstanding Huron's consent if Huron does not exercise its right to terminate. (*See* D.I. 25-1 at RA-7) It is untenable for Huron to possess an indefinite right to terminate, yet simultaneously permit the Debtors to assign the agreement if Huron does not exercise that right.

To the extent that these two clauses are incongruent, the License Agreement "supersedes conflicting portions of the Consulting Agreement and any other prior agreements . . . ." (*Id.* at RA-6) Thus, according to the plain language of the License Agreement: if a Change of Status occurs, Huron can immediately terminate the agreement by delivering written notice upon that change. If it does not deliver written notice upon the Change of Status, the right to terminate yields to the Debtors' rights under § 7.1 of the License Agreement. Because Huron did not exercise its right to terminate, the License Agreement became assignable without Huron's consent.

Huron next contends that the Confirmation Order preserved its right to object to the Debtors' assumption of the License Agreement. (D.I. 15 at 12) This is correct, but does not impact the Debtors' ability to assume. Huron has objected to the Debtors' assumption of the License Agreement in the Bankruptcy Court and in this Court. The right to raise an objection to assumption does not equate to the right to prevent assumption.

Lastly, Huron's reference to the footnote in *Watts v. Pennsylvania Hous. Fin. Co.*, 876 F.2d 1090, 1096 n.11 (3d Cir. 1989), is unavailing. This footnote merely outlines a course of action that a non-debtor may take before terminating an executory contract in order to avoid

9

violating the automatic stay. This has no impact on Huron's purported right to terminate or the standard for assumption under 11 U.S.C. § 365(c).

Because the License Agreement is assignable under 11 U.S.C. § 365(c), the Third Circuit's "hypothetical test" dictates that it is also assumable. *See In re West Electronics Inc.*, 852 F.2d at 83. Therefore, the Court affirms the Bankruptcy Court's conclusion that 11 U.S.C. § 365(c) permits the assumption of the License Agreement.

### B. Whether All Agreements Constitute One Contract

Though the License Agreement is assumable, the Court must next discuss whether the Bankruptcy erred by finding that the Debtors could independently assume this agreement without also assuming the other Agreements. The Bankruptcy Court rejected Huron's theory and found that all six Agreements established separate contracts. (D.I. 1-1 at 13) This conclusion rested upon three observations. First, the Bankruptcy Court noted that the parties signed the six Agreements at three different times. (*Id.*) Second, it determined that certain clauses in the License Agreement and the Master Agreement contradicted one another, and because the Master Agreement "takes the back seat" in such circumstances, the parties did not intend to create a unified contract. (*Id.*) Finally, the Bankruptcy Court reasoned that the integration clause in the Master Agreement does not demonstrate the parties' intent to create one contract, but instead operates to eliminate parole evidence. (*Id.*)

After reviewing the Bankruptcy Court's Opinion, the parties' briefs, and the applicable authority, and having heard oral argument, the Court concludes that the parties intended for the May 19 Agreements to formulate one complete contract. Thus, the Bankruptcy Court erred by permitting the Debtors to assume the benefits of the License Agreement without the burdens of the Master Agreement.

10

The Third Circuit has held that the principle of *cum onere* applies to a debtor's assumption of an executory contract under 11 U.S.C. § 365. *See In re Fleming Cos.*, 499 F.3d at 308. Accordingly, "[s]ection 365(f) requires a debtor to assume a contract subject to the benefits and burdens thereunder." *Id.* Pennsylvania law[6] recognizes that separately drafted agreements can embody a single contract. The Pennsylvania Supreme Court has stated that "[i]f contracting parties choose, they may express their agreement in one or more writings and, in such circumstances, the several documents are to be interpreted together, each one contributing (to the extent of its worth) to the ascertainment of the true intent of the parties." *Int'l Milling Co. v. Hachmeister, Inc.*, 110 A.2d 186, 191 (Pa. 1955). "To determine whether or not a writing is the parties' entire contract, the writing must be looked at and 'if it appears to be a contract complete within itself, couched in such terms as import a complete legal obligation without any uncertainty as to the object or extent of the [parties'] engagement, it is conclusively presumed that [the writing represents] the whole engagement of the parties . . . .'" *Yocca v. Pittsburgh Steelers Sports, Inc.*, 854 A.2d 425, 436 (Pa. 2004) (citing *Gianni v. Russell & Co.*, 126 A. 791, 792 (Pa. 1924)) (brackets original).

Thus, the propriety of the Bankruptcy Court's decision to grant the Motion to Assume turns on whether the parties intended for the May 19 Agreements to establish one unitary contract or several independent agreements. "When the parties have reduced their agreement to writing, the writing is to be taken to be the final expression of their intention." *Steuart v. McChesney*, 444 A.2d 659, 662 (Pa. 1982). If the terms of the contracts are clear and unambiguous, the reviewing court interprets these terms as a matter of law. *See Allegheny Int'l,*

---

[6] The parties do not dispute that Pennsylvania contract law governs these Agreements. (*See* D.I. 21-27 at DA-1375; *see* D.I. 17-21 at DA-1151)

*Inc. v. Allegheny Ludlum Steel Corp.*, 40 F.3d 1416, 1424 (3d Cir. 1994); *Panetta v. SAP Am., Inc.*, 2007 WL 1001889, at *3-4 (E.D. Pa. Mar. 30, 2007).

First, the Court does not agree with the Bankruptcy Court regarding the impact of the timing of the parties' execution of the Agreements. (*See* D.I. 1-1 at 13) Simultaneous execution of multiple agreements is not required for those agreements to establish a single contract. "[W]here the parties execute several related agreements with the apparent intention that the agreements govern a single transaction collectively, the agreements should be construed as a single whole even when they are executed at different times." *Allegheny Enterprises, Inc. v. J-W Operating Co.*, 2014 WL 866478, at *5 (M.D. Pa. Mar. 5, 2014); *see also Sanford Inv. Co. v. Ahlstrom Mach. Holdings, Inc.*, 198 F.3d 415, 421 (3d Cir. 1999) ("This rule applies equally where several agreements are made as part of one transaction even though they are executed at different times.") (applying Pennsylvania law). Further, the Court (and this appeal) is focused on the potential scope of the May 19 Agreements, all of which the parties executed on the same day.

Second, the Court disagrees with the conclusions that the Bankruptcy Court draws from certain provisions of the Master Agreement and the License Agreement. These provisions state:

> This Agreement, subsequent Project Arrangement Letters and related exhibits, including the License Agreement, the Support Agreement and Business Associate Agreement, represent the entire, final and complete agreement between Client and Huron with regard to the services Huron will perform. This Agreement supersedes and replaces any prior discussions, representations or agreements, written or oral, as to its subject matter.

(D.I. 25-2 at RA-19) ("Section 11.15 of the Master Agreement")

> This Agreement, and the relevant portions of the Consulting Agreement constitute the entire agreement of the parties with respect to the subject matter of this Agreement. Specifically, the terms and conditions of the Master Agreement are incorporated into this Agreement by this reference.

12

(D.I. 25-1 at RA-6) ("Section 5 of the License Agreement")[7] The Bankruptcy Court posited that these clauses "simply mean[ ] all of the Agreements between the parties are reflected in the Agreements as written, thereby eliminating parole evidence." (D.I. 1-1 at 13)

This interpretation does not fully effectuate the intent of the parties as expressed in those provisions. The Court's task is to look to the plain language of the Agreements to determine if the parties expressed the intent to create a single contract to govern the entire transaction. *See Sanford Inv. Co.*, 198 F.3d at 421; *Steuart*, 444 A.2d at 662. Though portions of the Entire Agreement Clauses likely do bar parole evidence, they also evince a more robust intent. Both clauses dictate that the scope of the parties' complete agreement encompasses more than simply the four corners of any single document. (D.I. 25-2 at RA-19; D.I. 25-1 at RA-6) "This Agreement, [and other Agreements], including the License Agreement, . . . ***represent the entire, final and complete agreement between Client and Huron with regard to the services Huron will perform.***" (D.I. 25-2 at RA-19) (emphasis added) In this way, the Master Agreement identifies the scope of the transaction – Huron's provision of services – and states that the multiple documents create one agreement to govern that transaction. *See Sanford Inv. Co.*, 198 F.3d at 423 ("Because each document sets forth different aspects of the overall transaction, the provisions of each must be understood in that context and applied so as to recognize their distinct purpose.")

The License Agreement mirrors this structure, specifically incorporating the terms of the Master Agreement into its terms. (*See* D.I. 25-1 at RA-6) ("[T]he terms and conditions of the Master Agreement are incorporated into this Agreement by this reference.") Separate agreements that refer to each other and import each other's terms, without countervailing

---

[7] The Court will collectively refer to section 11.15 of the Master Agreement and section 5 of the License Agreement as the "Entire Agreement Clauses."

13

restrictive language, provide a clear indication that the parties intended for those agreements to establish one complete agreement. *See Allegheny Enterprises*, 2014 WL 866478, at *6 ("[T]he Exploration Agreement, Assignment, and Termination Agreement should be construed with reference to each other. The Assignment and Termination Agreement both refer back to the Exploration Agreement, and the three agreements all purport to govern the parties' relationship as to their mutual interests .... The only reasonable inference is that the parties contemplated the interaction of the agreements."). Thus, the Court concludes that the Entire Agreement Clauses indicate the parties' intent that the May 19 Agreements be read as a single contract.

The Court further disagrees with the Bankruptcy Court's conclusion that the Agreements cannot form one contract because, in the event of conflicting terms, "the Master Agreement takes the back seat." (D.I. 1-1 at 13) The Bankruptcy Court references the following clause:

> "In the event an issue is addressed both in this [Master] Agreement and in a Project Arrangement Letter or other document that relates to a specific Project, the terms of that Project Arrangement Letter or other Project-specific document shall govern to the extent they are inconsistent and in conflict with the terms of this Agreement."

(D.I. 25-2 at RA-19) Comparably, the License Agreement provides that it "supersedes conflicting portions of the Consulting Agreement and any other prior agreements ...." (D.I. 25-1 at RA-6)[8] Though the Master Agreement arguably does "take the back seat" to the License Agreement in the event of a conflict, this provision does not itself render the two agreements incompatible. Separate agreements can still form a single contract even if certain provisions between them conflict. *See Huegel v. Mifflin Const. Co.*, 796 A.2d 350, 356–57 (Pa. Super. Ct. 2002) ("[W]e hold that the integration clause combined with the numerous references in the third contract to the second contract effectively incorporated the second contract into the third contract

---

[8] The Court will collectively refer to both clauses as "the Conflict Clauses."

14

*to the extent that the second contract does not conflict with any of the provisions within the third contract.*") (emphasis added)

In *Allegheny Enterprises*, 2014 WL 866478, at *6, the U.S. District Court for the Middle District of Pennsylvania illustrated this principle in an analogous dispute. The parties in that case fought over whether a series of oil and gas agreements they executed between 2002 and 2004 established a single contract. *Id.* at *2–3. As a matter of law, that Court found that the several agreements did form one whole contract. *Id.* at *6. In reaching this conclusion, the Court rejected the argument that a conflicting-terms clause in one agreement limited the incorporation of the terms of the other agreements. *Id.* The provision at issue stated that "[i]n the event of any conflict or inconsistency between the terms of the Assignment and Exploration Agreement, the latter agreement controls." *Id.* The *Allegheny Enterprises* Court explained that "[g]iven its natural sense, th[is] sentence supplies a rule for construing provisions of the Assignment against conflicting provisions of the incorporated Exploration Agreement; th[is] sentence does not purport to limit the scope of the incorporation itself." *Id.*

The Court agrees with this reasoning. According to the Conflict Clauses, if certain terms in the Agreements contradict, the parties agreed to resolve that tension by adhering to the terms of the License Agreement. Considering that the Agreements already convey mutual incorporation in the Entire Agreement Clauses, these additional provisions reinforce the notion that the parties intended for the terms of all Agreements to interact as one.

For similar reasons, the Bankruptcy Court's analysis of the indemnity provisions in the Master Agreement and the License Agreement does not undermine this Court's conclusions. (D.I. 1-1 at 11) The Bankruptcy Court reasoned that "[i]f the Master Agreement and the License Agreement are to be read as a single agreement, there would be no need for indemnity language

15

in the License Agreement." (*Id.*) The Court disagrees. The two indemnity provisions are not identical. (*Compare* D.I. 25-1 at RA-3, § 2 *with* D.I. 25-2 at RA-10, §§ 4.1-4.2) As noted above, the parties structured the Agreements such that the terms of the License Agreement (or any more specific document) supersede the terms of the Master Agreement in the event of a conflict. (*See* D.I. 25-2 at RA-19) Thus, if an issue implicates the indemnity rights provided under the License Agreement, then those terms control; otherwise, the indemnity rights of the Master Agreement may govern. Viewing the indemnity provisions through the lens of the Conflict Clauses reveals that they are not necessarily redundant or superfluous as the Bankruptcy Court implies. Nor does the Court perceive a conflict between the two indemnity provisions. Each indemnity provision pertains to different scenarios, but to the extent that they do overlap in some instances, the License Agreement's indemnity provision controls.

The Debtors stress two cases that highlight what they contend are similar inconsistent indemnity provisions. (D.I. 24 at 15) (citing *Butcher v. Dravo Corp.*, 2009 WL 799746 (W.D. Pa. Mar. 25, 2009), and *Chester Upland Sch. Dist. v. Edward J. Meloney, Inc.*, 901 A.2d 1055 (Pa. Super. Ct. 2006)) These cases differ from the present dispute in two important respects. First, neither *Butcher* nor *Chester Upland Sch. Dist.* confronted the issue of whether multiple agreements created one complete contract. Second, the contracts at issue in those cases did not contain language explaining how to interpret inconsistencies among the contracts. The issue in both cases was which one of the competing indemnity provisions should control. *See Butcher*, 2009 WL 799746 at *30–33; *Chester Upland Sch. Dist.*, 901 A.2d at 1061–62. In *Butcher*, the court concluded that because the two contracts covered the same transaction, the subsequent contract superseded the contract executed three and a half years earlier. *See Butcher*, 2009 WL 799746 at *33. In *Chester Upland Sch. Dist.*, the court construed the ambiguous indemnification

provisions against the drafter and applied the more restrictive of the two. *See Chester Upland Sch. Dist.*, 901 A.2d at 1062. Here, by contrast, the Court need not resort to such methods of contract construction to resolve any conflict between the indemnity terms. The May 19 Agreements not only provide that they are part of the same contract, but also explain how to resolve inconsistencies when they arise. Unlike *Butcher* and *Chester Upland Sch. Dist.*, these provisions allow the Court to read the indemnity clauses in harmony, rather than in conflict.

The parties' stated intent as expressed in the License Agreement and the Master Agreement compel this Court to conclude as a matter of law that the May 19 Agreements constitute a single contract. Consequently, the Bankruptcy Court erred by granting the Debtors' Motion to Assume and allowing the Debtors to assume the benefits of the License Agreement while rejecting the burdens of the Master Agreement.[9]

Having reached these conclusions, the Court will reverse the Bankruptcy Court and remand for further proceedings. The Court declines Huron's request to impose the terms of the Master Agreement upon the Debtors. Instead, on remand, the Debtors must now choose between rejecting or assuming the May 19 Agreements as one.[10]

The Court reiterates its above finding that Huron's right to terminate the License Agreement has lapsed. Thus, the parties should not misconstrue this Opinion as immediately terminating the Debtors' ability to use Huron's software; instead, it temporarily returns the

---

[9] As a result of this decision, the Court need not consider the final issue of whether the Debtors exercised sound business judgment in assuming the License Agreement.

[10] At the hearing, counsel for both parties updated the Court as to the current status of the case. Based on these representations, the Court understands that the Debtors are in the process of transitioning to a new revenue management software, but the changeover may last several more months.

17

parties to the post-confirmation status quo. The Bankruptcy Court must determine any remaining details on remand.

## V.     CONCLUSION

For the reasons explained above, the Bankruptcy Court's Opinion and Order granting the Debtors' motion to assume the Licensing Agreement and reject all other Agreements is REVERSED, and this matter is REMANDED for the Bankruptcy Court to proceed in a manner not inconsistent with this Court's Order.